# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 16, 2023          Decided July 7, 2023

No. 22-5095

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
APPELLANTS

v.

U.S. INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01491)

*William J. Snape, III* argued the cause for appellants. With him on the briefs was *Margaret A. Coulter*.

*Michelle Harrison* was on the brief for *amicus curiae* Accountability Counsel in support of appellants.

*Nicholas S. Crown*, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern* and *Samantha L. Chaifetz*, Attorneys.

Before: MILLETT, PILLARD, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: The Sunshine Act's "agency" definition only encompasses those with a majority of Board members whom the President appoints, and the Senate confirms, to such position. Government in the Sunshine Act (Sunshine Act), Pub. L. No. 94-409, 90 Stat. 1241, 1241 (1976) (codified at 5 U.S.C. § 552b(a)(1)). For years, the Center for Biological Diversity, Friends of the Earth, and the Center for International Environmental Law (collectively, CBD) enjoyed the sunlight from the Sunshine Act's application to the Overseas Private Investment Corporation (OPIC). It provided CBD, with, among other things, notice, transcripts, and minutes of OPIC's various meetings. *See* 5 U.S.C. § 552b(e)(1)–(f)(2).

But in 2018, Congress arguably switched off OPIC's lights. By statute, it reorganized OPIC into the International Development Finance Corporation (DFC). Relative to its OPIC predecessor, Congress shrunk DFC's Board of Directors (the Board) from fifteen members to nine. DFC's Chief Executive Officer (CEO) serves by virtue of their appointment to DFC instead of to the Board itself, like four other Board members appointed to other agencies. Thus, DFC thought its Board majority was composed only of ex officio members. Accordingly, it promulgated a rule exempting itself from the Sunshine Act without notice-and-comment.

CBD sued. The district court granted DFC's motion to dismiss, deciding that: CBD had informational standing, DFC was not subject to the Sunshine Act, and it was harmless error for DFC to promulgate a rule without notice-and-comment. We affirm.

We first hold that CBD clearly had informational standing under *Federal Election Commission v. Akins*, 524 U.S. 11, 19–21 (1998), because the information it statutorily sought is from the agency itself.  Next, we hold that the Sunshine Act does not apply to DFC because a majority of its Board members serves ex officio by virtue of their appointments to other positions.  Finally, we hold that CBD's claim that DFC violated the Administrative Procedure Act (APA) by not engaging in notice-and-comment rulemaking fails because CBD did not demonstrate any prejudice arising from the asserted APA violation distinct from the legal question of Sunshine Act compliance.

## I.

### A.

In 1976, Congress enacted the Sunshine Act to ensure that multi-member federal agencies hold their deliberations open and accessible to the public.  *See Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 928 (D.C. Cir. 1982).  The Sunshine Act requires that every "meeting" of a covered "agency" be conducted publicly, with only a few exceptions.  *See* 5 U.S.C. § 552b(b), (c).  But it only applies to "any agency . . . headed by a collegial body composed of two or more individual members, a majority of whom are *appointed to such position* by the President with the advice and consent of the Senate . . . ."  *Id*. § 552b(a)(1) (emphasis added).

Until 2018, OPIC was a United States government agency that complied with the Sunshine Act.  Foreign Assistance Act of 1969, Pub. L. No. 91-175, 83 Stat. 805, 810 (1969) (codified as amended in 22 U.S.C. § 2191 *et seq.*) (repealed 2018); *see also* 22 C.F.R. § 708 (1977).  OPIC's primary mission was to provide financing to support private-sector investment in

developing countries and emerging markets. CONG. RSCH. SERV., IF10659, OVERSEAS PRIVATE INVESTMENT CORPORATION (OPIC) 1 (2017). With fifteen Board members, eight of whom were appointed by the President and confirmed by the Senate to the Board itself, the Sunshine Act applied to OPIC. 22 U.S.C. § 2193(b) (repealed 2018). In the 2018 BUILD Act, however, Congress combined OPIC with the Development Credit Authority (DCA) of the United States Agency for International Development to create DFC. 85 Fed. Reg. 20,423, 20,423/1 (Apr. 13, 2020); *see also* Better Utilization and Investments Leading to Development Act (BUILD Act), Pub. L. No. 115-254, div. F, 132 Stat. 3485, 3485-519 (2018) (codified as amended at 22 U.S.C. §§ 9601–9689).

DFC's Board contains nine members. With Senate confirmation, the President appoints four out of DFC's nine Board members to the Board itself. 22 U.S.C. § 9613(b)(2)(A). Four other Board members serve by virtue of their appointment and confirmation to other offices. That includes the Secretary of State, the Administrator of the United States Agency for International Development, the Secretary of Treasury, and the Secretary of Commerce. *Id.* § 9613(b)(2)(B). As for DFC's CEO, the last remaining Board member, they are only appointed "in the Corporation." *Id*. § 9613(d)(1).

On April 13, 2020, DFC promulgated a rule (Sunshine Act Rule) that exempted itself from Sunshine Act compliance without notice-and-comment. Compl. ¶ 9, J.A. 27; 85 Fed. Reg. 20,423, 20,423/1–2 (Apr. 13, 2020). In the rule, the agency stated that "the Sunshine Act . . . is not applicable to DFC," 85 Fed. Reg. 20,423, 20,423/1 (Apr. 13, 2020), because "[o]nly four of the nine DFC board members are appointed by the President with the advice and consent of the Senate solely for the purpose of serving on DFC's Board." *Id.* at 20,423/2.

Thus, the majority of its Board serves ex officio, that is by virtue of the Board members' appointments either to a non-Board position within the same agency or other agencies.

**B.**

DFC's conclusion was guided by an opinion and a letter from the Department of Justice's Office of Legal Counsel (OLC). Letter from Liam P. Hardy, Deputy Assistant Att'y Gen., Dep't of Justice, to Kevin L. Turner, Vice President & Gen. Counsel, DFC (Feb. 25, 2020) [hereinafter 2020 O.L.C. Ltr.]; Whether the Millennium Challenge Corporation is Subject to the Open Meeting Requirements of the Sunshine Act, 37 Op. O.L.C. 27, 27–32 (2013) [hereinafter 2013 O.L.C. Op.]. The 2013 OLC opinion related to a different agency posing a similar Sunshine Act issue: the Millennium Challenge Corporation (MCC). 2013 O.L.C. Op. 27. The 2020 OLC letter concerned DFC, which had solicited OLC's view. OLC reached the same conclusion in its opinion and letter: an agency with a majority of ex officio Board members is not subject to the Sunshine Act, even if the Board includes members who serve by virtue of their appointment to the same agency. 2020 O.L.C. Ltr. ("The fifth director, DFC's Chief Executive Officer, is also 'properly regarded as one of these ex officio members because by statute the CEO is appointed to a separate office and serves on the Board by virtue of that separate office.'" (quoting 2013 O.L.C. Op. 4)).

In 2021, CBD sued DFC, alleging that the agency violated the APA in three ways. First, it contended that DFC's Sunshine Act Rule was arbitrary and capricious. Second, it complained that DFC's failure to promulgate Sunshine Act regulations constituted agency action "unlawfully withheld and unreasonably delayed." Compl. ¶ 70, J.A. 38 (citing 5 U.S.C. §§ 552b(b), (j), (k); 706(1)). Finally, it argued that DFC

violated the APA by failing to put the Sunshine Act Rule through notice-and-comment procedures. DFC moved to dismiss CBD's complaint, which the district court granted.

The district court first addressed the jurisdictional issue of whether CBD had informational standing and concluded that it did. Under this Court's standard in *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), the district court found that informational standing existed, because "[p]laintiffs have alleged a right under the Sunshine Act to obtain the information they seek, a specific denial of that right by the agency, and a resulting injury flowing from the denial." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 72 (D.D.C. 2022). The district court also reasoned that no specific denial—such as rejection of a plaintiff's request for a meeting—need be shown to establish an injury. *Id.*

Moving to the merits, the district court combined CBD's remaining two claims into one question: whether DFC is subject to the Sunshine Act. It determined that *Symons v. Chrysler Corporation Loan Guarantee Board*, 670 F.2d 238 (D.C. Cir. 1981), was controlling. *Symons* held that the Chrysler Corporation Loan Guarantee Board (Chrysler Board) was not an "agency" subject to the Sunshine Act. *Id.* at 240–41. Because all the Board members served "by virtue of the other offices they hold[,]" and thus were not "appointed to such position[,]" the Chrysler Board was not subject to the Sunshine Act. *Id.*

Applying *Symons* here, the district court decided that DFC's CEO serves "by virtue of" their appointment to that position, and thus cannot constitute the Board's fifth member to form a Sunshine Act "agency." *Ctr. for Biological Diversity*,

585 F. Supp. 3d at 77–78. It further reasoned that the BUILD Act's legislative history was not instructive of whether Congress intended that DFC remain subject to or become exempt from the Act. *Id.* at 77 n.2. Importantly, the district court left it open for this Court to decide whether it would like to distinguish or overturn *Symons* in the first instance.

The district court dismissed as harmless error that DFC failed to engage in notice-and-comment when promulgating its Sunshine Act rule which exempted itself from Sunshine Act compliance. *Id.* at 73–75. It did not answer if DFC was required to conduct notice-and-comment in its rule because "[n]either side present[ed] caselaw" that squarely answered whether said rule was procedural or legislative. *Id.* at 75. Regardless, because DFC's "conclusion [was] compelled by the language of the two statutes at issue and binding D.C. Circuit precedent[,]" the district court concluded that no amount of procedure would have remedied CBD's alleged harm. *Id.* at 75.

## C.

We have jurisdiction pursuant to 28 U.S.C. § 1291. And this Court reviews de novo the district court's grant of DFC's motion to dismiss CBD's complaint. *See King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007).

## II.

## A.

Before we proceed to the merits, we begin with standing— a jurisdictional question. *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1018 (D.C. Cir. 1998) ("Because the standing

question goes to our jurisdiction, we address it first."). The "irreducible constitutional minimum" to establish standing is whether the plaintiff (i) suffers an injury in fact, such that the interest is concrete and actual or imminent, (ii) demonstrates a causal connection between the injury and the conduct, and (iii) complains of a legally redressable injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). On the first prong, the Supreme Court held informational injury sufficient to satisfy standing. *Akins*, 524 U.S. at 24; *Pub. Citizen v. U.S. Dep't. of Just.*, 491 U.S. 440, 449 (1989); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982). To prove an informational injury, a plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (citation and quotation omitted). For purposes of standing, "we assume the merits in favor of the plaintiff." *Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 533 (D.C. Cir. 2017).

In *Akins*, the Supreme Court noted that the injury in fact analysis for informational harm rests only on a plaintiff's "inability to obtain information." 524 U.S. at 21. The Court did not specify whether an inability to obtain information must result from a specific denial, requiring a plaintiff to first seek access and be denied the information they request, or whether a plaintiff needs only rely on a lack of notice, as CBD does in this appeal. However, *Akins* did make clear that when a plaintiff "fails to obtain information which must be publicly disclosed pursuant to a statute," they are injured. *Id.* And there, respondents, like CBD, sought information from the Federal Election Commission, which it believed was statutorily required to be made public under the Federal Election Campaign Act—without any specific denial. *See id.* at 19–26.

Because CBD statutorily seeks information from the agency itself, it need not receive a specific denial to sustain an informational injury. CBD's complaint is squarely within this Court's precedents. For example, a plaintiff suffers an informational injury when an agency, like DFC here, adopts a rule that places a legally unsupported limit on its statutory reporting requirements. *See Waterkeeper All.*, 853 F.3d at 533. We have also held that a plaintiff has informational standing, so long as the plaintiff has a statutory right to seek the information that the agency withheld. *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016). But when a plaintiff claims an informational injury with no statutory support, standing will be in jeopardy. *See Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011).

Here, CBD easily clears the informational injury hurdle. On its interpretation of the Sunshine Act, CBD claims that it was denied notice about certain meetings, preventing it from attending and engaging with DFC. In relevant part, Section 552b(b) states:

> [Agencies bound by the Sunshine Act] shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency *shall* be open to public observation.

5 U.S.C. § 552b(b) (emphasis added). Public observation requires that agencies "*shall* make [a] public announcement, at least one week before the meeting, of the time, place, and subject matter of the meeting, whether it is to be open or closed to the public, and the name and phone number of the official designated by the agency to respond to requests for information

about the meeting." *Id.* § 552b(e)(1) (emphasis added); *see also id.* § 552b(e)(3) (requiring that notice "also be submitted for publication in the Federal Register"). The Sunshine Act also provides the right to a transcript, an electronic recording, or minutes of closed portions of meetings, which the agency "shall make promptly available to the public" and "shall maintain . . . for a period of at least two years after such meeting, or until one year after the conclusion of any agency proceeding with respect to which the meeting or portion was held, whichever occurs later." *Id.* § 552b(f)(2). Given Congress's clear command for any agency subject to the Sunshine Act to provide robust public information, there can be no doubt that these provisions create a right to information sufficient for CBD's injury.

Furthermore, CBD suffers the type of harm the Sunshine Act envisioned. CBD identified several DFC meetings that were held without sufficient Sunshine Act notice in the Federal Register, and that were closed to the public without valid exception. *See, e.g.*, Compl. ¶ 57, J.A. 36 (specifying that the Dec. 10, 2020, and Mar. 9, 2021, meetings were held without notice); DeAngelis Decl. ¶ 8, J.A. 48–49 (specifying the Sept. 9, 2020, meeting as closed); *see also* 5 U.S.C. § 552b(c)(1)–(10) (noting permitted exceptions for closed meetings). Specific deliberations relevant to their work, like votes on international development projects in Mozambique and India, occurred at these meetings. DeAngelis Decl. ¶ 8, J.A. 48–49 (noting a board vote on a project in Mozambique); Supp. DeAngelis Decl. ¶ 8, J.A. 67 (noting that up to a $250 million loan for a vehicle finance program in India and $50 million in political risk insurance to Sierra Leone was approved at the Dec. 8, 2021, meeting). And CBD was effectively denied access to the meetings that it otherwise would have attended because of deficient notice. *See* DeAngelis Decl. ¶ 8, J.A. 48; Norlen Decl. ¶ 7, J.A. 53.

CBD's injury is also traceable and redressable. It is "fairly traceable to the challenged action" because DFC's Sunshine Act rule deprived CBD of advance notice it would have otherwise received for numerous meetings. *Lujan*, 504 U.S. at 560–61 (alterations and citation omitted). Also, CBD's alleged injury could be "redressed by [this Court's] favorable decision" because we are asked whether, as a legal matter, DFC must comply with the Sunshine Act. *Id.* Thus, CBD has informational standing to bring its claims.

**B.**

We next answer whether the Sunshine Act applies to DFC. We think not.

Starting with the statutory text, the Sunshine Act states:

(a) For purposes of this section—

(1) the term "agency" means any agency, as defined in section 552(e) of this title, headed by a collegial body composed of two or more individual members, *a majority of whom are appointed to such position by the President with the advice and consent of the Senate*, and any subdivision thereof authorized to act on behalf of the agency[.]

5 U.S.C. § 552b(a)(1) (emphasis added); *Bellagio, LLC v. Nat'l Lab. Rels. Bd.*, 863 F.3d 839, 847 (D.C. Cir. 2017) (quoting *NetCoalition v. S.E.C.*, 715 F.3d 342, 348 (D.C. Cir. 2013)) ("So '[w]e begin, as we must, with the text of the statute.'"). We focus on two phrases: "majority of whom" and "appointed to such position." 5 U.S.C. § 552b(a)(1). From the first phrase, we deduce, and the parties agree, that DFC's CEO is the

consequential member determining whether DFC is subject to the Sunshine Act. Appellants' Br. 13; Appellee's Br. 17–18. Pursuant to the BUILD Act, DFC's Board consists of nine members. *See* 22 U.S.C. § 9613(b)(2)(A). Four members of DFC's Board are appointed by the President and confirmed by the Senate to the Board. *Id.* § 9613(b)(2)(A)(iii). Another four members of DFC's Board serve ex officio or by virtue of their appointment and confirmation to other positions. *Id.* § 9613(b)(2)(A)(ii), (b)(2)(B)(i). They include the Secretary of State, the Administrator of the United States Agency for International Development, the Secretary of Treasury, and the Secretary of Commerce or their designees. *Id* § 9613(b)(2)(B)(i). The CEO remains. But they are appointed only "in the Corporation," like the Deputy CEO. *Id.* § 9613(a), (d)(1), (e). Nowhere in the BUILD Act does it clearly state that the President appoints, with Senate confirmation, DFC's CEO to the Board itself. *See id.* § 9613(b)(2)(A)(i) (describing DFC's CEO as a member of the Board); *id.* § 9613(d)(3) (stating that DFC's CEO "shall report and be under the direct authority of the Board").

Having interpreted that where DFC's CEO is appointed is consequential, we move to the second relevant statutory phrase in the Sunshine Act: "appointed to such position[.]" 5 U.S.C. § 552b(a)(1). Specifically, we must answer whether that phrase requires the CEO to be appointed to the Board itself for the Sunshine Act to apply. Reaffirming our holding in *Symons*, we answer yes, again. 670 F.2d at 241, 245.

More than forty years ago, this Court held that the Chrysler Board was *not* subject to the Sunshine Act because it interpreted "appointed to such position[,]" 5 U.S.C. § 552b(a)(1), to exclude Board members who are appointed and confirmed "*to other high government offices.*" *Symons*, 670 F.2d at 241 (emphasis added). The Chrysler Board was

different than DFC's Board at issue here: its *entire* Board of five members served ex officio. *Id.* at 240. It included the Secretary of Treasury, the Chairman of the Board of Governors of the Federal Reserve System, the Comptroller General of the United States, and the Secretary of Labor and Transportation. *Id.* Each was appointed and confirmed to *other* agencies. *Id.* CBD tells us *Symons* is distinguishable because DFC's Board only has a minority of members appointed and confirmed to other agencies. Appellants' Br. 22–24. The CEO is appointed to DFC and functionally serves on the Board. *See id.* 14–15. Thus, ex officio appointments, as conceived in *Symons*, are restricted to only inter-agency appointments, not intra-agency ones. We disagree.

The central holding of *Symons* forecloses CBD's argument. "[A]ppointed to such position" in the Sunshine Act requires that the majority of an agency's Board members be appointed to the Board itself, not serve ex officio. 5 U.S.C. § 552b(a)(1). In *Symons*, the dissent reasoned that the Sunshine Act's statutory definition could include ex officio members because, at the time of their appointments, they would automatically serve both on the Board ex officio and their underlying appointments simultaneously. 670 F.2d at 245–49 (Wald, J., dissenting). However, as the majority reasoned in response to the dissent, reading Section 552b(a)(1) that way would "not [be] favored by the law and would violate a fundamental rule of statutory interpretation–that in construing statutes[,] courts should give effect, if possible, to every word used by Congress." *Id.* at 242 (majority opinion). Given *Symons*'s holding, it is of no moment whether an agency's majority of ex officio members is as large as the entire Board or as small as just one member—a majority is a majority. It is also insignificant whether a Board member is appointed

and confirmed to a non-Board position within the same agency or in another agency—both count as ex officio.[1]

That the Senate confirmed DFC's CEO to DFC itself, with no mention of the Board, is unsurprising. *Roll Call Vote 117th Congress – 2nd Session*, U.S. Senate, Feb. 9, 2022, https://perma.cc/8G7X-XVMY. The BUILD Act ensures that DFC's CEO is the fifth *government* member who serves ex officio and maintains accountability elsewhere. 22 U.S.C. § 9613(b)(2)(B)(i); *see also* Oral Arg. Tr. 29:10–25, 30:1–8. On the other hand, the BUILD Act describes the four Board appointees as "nongovernment members," 22 U.S.C. § 9613(b)(2)(C), and restricts them from serving as "an officer or employee of the United States Government." *Id.* § 9613(b)(2)(C)(i). Consequently, the Board's direct appointee minority lacks the same accountability structure. When a Board's majority is composed of government members, who are already accountable by virtue of their appointment and confirmation to other positions, then the Sunshine Act does not apply. *See* Oral Arg. Tr. 29:10–25, 30:1–8. While DFC's CEO may have concurrent Board duties, their responsibilities do not mean that they were appointed to the Board itself.

---

[1] A year before *Symons*, this Court correctly observed that an agency as defined by the Sunshine Act is a subset of the agency definition under the Freedom of Information Act (FOIA). *See Pac. Legal Found. v. Council on Env't Quality*, 636 F.2d 1259, 1261 (D.C. Cir. 1989). The reasoning in *Pacific Legal Foundation* that the Sunshine Act "incorporates by reference the definition of 'agency'" in FOIA spoke only to the definitional aspect relevant there—the placement of an "agency" in the executive branch. *Id.* at 1263; *see id.* at 1263–64. Any suggestion there that FOIA agencies are all subject to the Sunshine Act is unnecessary dicta because the government there conceded that it was subject to the Sunshine Act. *See id.* at 1263.

CBD contends that we should read Congress's silence regarding where DFC's CEO is appointed in its favor, because "Congress did *not* say it was curtailing any public access that previously existed under the Sunshine Act when replacing the Overseas Private Investment Corporation with the new Development Finance Corporation in the BUILD Act." Appellants' Br. 16 (emphasis added). But DFC's origins do not support the inference CBD urges. When Congress created the DFC, it combined OPIC with DCA of the United States Agency for International Development. 85 Fed. Reg. 20,423, 20,423/1 (Apr. 13, 2020). While OPIC was subject to the Sunshine Act, the DCA was not, because it was led by a single administrator. *See* Foreign Assistance Act of 1961, Pub. L. No. 87-195, § 624, 75 Stat. 424, 447 (1961) (codified at 22 U.S.C. § 2151w(a)). Given that one of the DFC's predecessors was subject to the Sunshine Act, while the other was not, even accepting CBD's assumption that Congress sought continuity would not tip the scale in favor of Sunshine Act coverage.

Although Congress did not subject DFC to the Sunshine Act in the BUILD Act, it required some important alternative measures of transparency. DFC is still required to hold two public hearings a year instead of OPIC's only one public hearing per year. 22 U.S.C. § 9613(c) (repealed 2018).

Furthermore, the Department of Justice's OLC twice agreed with this Court that the Sunshine Act does not apply to agencies with a majority of ex officio Board members, even if one or more of those members is appointed and confirmed to the agency itself. 2020 O.L.C. Ltr.; 2013 O.L.C. Op. 27–32. At the outset, we acknowledge that OLC's views are not binding, nor are they entitled to deference. We look to them for their persuasive value. *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 74 n.4 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017).

The 2013 OLC opinion concluded that MCC, whose board structure replicates DFC, was not subject to the Sunshine Act. 2013 O.L.C. Op. 27–32. Both agencies have a Board of nine members. *Compare* Millennium Challenge Act of 2003 (Millennium Act), Pub. L. No. 108-199, div. D, title VI, 118 Stat. 211, 213 (2004) (codified at 22 U.S.C. § 7703(c)(3)), *with* 22 U.S.C. § 9613(b)(2)(A). Both Boards have four members who serve by virtue of their appointment and confirmation to *other* agencies. *Compare* 22 U.S.C. § 7703(c)(3), *with* 22 U.S.C. § 9613(b)(2)(A). And both Boards have a remaining member, the CEO, who is not appointed to the Board itself. *Compare* 22 U.S.C. § 7703(b)(2)(A), *with* 22 U.S.C. § 9613(d)(1). The only difference is that the Millennium Act lists its CEO and its ex officio Board members in the same Board membership paragraph, whereas the BUILD Act notes them in separate provisions. *Compare* 22 U.S.C. § 7703(c)(3), *with* 22 U.S.C. § 9613(b)(2)(A)(ii); *see also* Appellants' Br. 25–26. But that does not dilute OLC's reasoning as applied to DFC.

Analyzing the Sunshine Act and *Symons*, OLC concluded that its "longstanding position" is that "the more natural reading of the [Sunshine Act] requires [presidential appointment and Senate confirmation] to a board or other 'collegial body.'" 2013 O.L.C. Op. 28. In doing so, it considered, but rejected, an ex officio distinction between Board members appointed to the agency but not to the Board. *Id.* at 31 (considering whether the ex officio Board members' presidential appointment and Senate confirmation and the CEO's appointment to the agency itself affected its opinion and concluding that it did not). Thus, OLC's opinion concerning the MCC operated as a background principle against the BUILD Act's creation.

If any reason existed to doubt the applicability of the 2013 OLC opinion, in 2020, seven years later, DFC asked OLC to confirm whether it should be subject to the Sunshine Act; OLC obliged. Appellee's Br. 10. But the answer did not change. OLC stated, "The fifth director, DFC's Chief Executive Officer, is also 'properly regarded as one of these ex officio members because by statute the CEO is appointed to a separate office and serves on the Board by virtue of that separate office.'" 2020 O.L.C. Ltr. (quoting 2013 O.L.C. Op. 4).

In sum, we see no reason to read the BUILD Act to treat the President's appointment and the Senate's confirmation to one position to count simultaneously for another unmentioned position in which that person serves ex officio. Unlike the BUILD Act, the Federal Vacancies Reform Act is an example of Congress making clear when the President can appoint, with Senate confirmation, a person to a different position, without a separate appointment process. Pub. L. No. 105-277, 112 Stat. 2681, 2681-611 (1998) (codified at 5 U.S.C. § 3345(a)(3)). There is no reason to imply any material deviation from the typical appointment and confirmation requirements here.

## III.

We finally turn to the last question on appeal: whether DFC violated the APA by failing to engage in notice-and-comment rulemaking. The district court concluded that DFC committed harmless error by excluding notice-and-comment, given that DFC is not subject to the Sunshine Act. *Ctr. for Biological Diversity*, 585 F. Supp. 3d at 73–75. Error is harmless "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Braniff Airways v. Civ. Aeronautics Bd.*, 379 F.2d 453, 466 (D.C. Cir. 1967) (citation omitted). Generally, "[w]e have not been hospitable to [] claims of

harmless error in cases in which the government violated § 553 of the APA by failing to provide notice." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). But error can be harmless if notice-and-comment would not alter the legal conclusion of the rule. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471–72 (D.C. Cir. 2014) (recognizing that "all the procedure in the world" could not change when statutory language, as interpreted under D.C. Circuit precedent, foreclosed the appellants' interpretation); *Hadson Gas Sys., Inc. v. Fed. Energy Regul. Comm'n*, 75 F.3d 680, 683–84 (D.C. Cir. 1996). Ultimately, it is the plaintiff's responsibility to show that an error is harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

We hold that CBD failed to assert harm distinct from the legal question of DFC's Sunshine Act compliance such that any error was harmless. On appeal, CBD argued that had notice-and-comment occurred: "the agency and public would have contemplated the Sunshine Act behavior of other federal agencies . . . similar . . . to the [DFC]"; "the Millennium Memo would have been discussed"; "a richer discussion of the Sunshine Act's goals and purposes would have occurred"; and CBD could discuss how it was "utterly uninformed of these closed door decisions." Appellants' Br. 30–31. Its argument in this Court mirrors the one it made below, submitting that its harm from a lack of notice-and-comment could have been remedied by DFC simply following the Sunshine Act. Opp. Mot. 24 ("Had DFC followed proper notice-and-comment requirements under 5 U.S.C. § 553, members of the public, including Plaintiffs, would have been able to obtain necessary information about agency decisionmaking, obtain access to agency meetings or minutes of those meetings, and notice of meeting closures as required by the Sunshine Act."); *see also* Compl. ¶ 61, J.A. 37. However, those alleged harms rise and fall with the Sunshine Act. For example, CBD does not argue

that notice-and-comment would have allowed it to urge DFC to adopt Sunshine Act-like compliant procedures, such as alternative ways to provide notice, transcripts, and minutes for specific meetings. Nor does it argue for other procedures that could have mitigated the harm from DFC's non-compliance with the Sunshine Act. If an agency fails to engage in notice-and-comment rulemaking, requiring the plaintiff to explain what is lost by the absence of such is not "a particularly onerous requirement." *Shinseki*, 556 U.S. at 410.

\* \* \*

For the foregoing reasons, we affirm the district court's grant of DFC's motion to dismiss. We hold that CBD had informational standing for its suit, but DFC is not subject to the Sunshine Act. And CBD failed to demonstrate prejudicial error arising from DFC's failure to engage in notice-and-comment rulemaking.

*So ordered.*